The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner, with some modification. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers Compensation Act.
2. The employer-employee relationship existed between the plaintiff and the defendant-employer on the date in question.
3. Continental Insurance Company is the carrier on the risk.
4. The plaintiff sustained an injury by accident, which arose out of his employment with the employer on or about November 30, 1994.
In addition, the parties stipulated into evidence the following:
1. Earnings statements for the period ending November 21, 1998.
2. A packet of medical records and reports containing 191 pages.
The Pre-Trial Agreement dated November 30, 1998 submitted by the parties at the hearing is incorporated by reference. The documents attached to the Pre-Trial Agreement and referred to in Exhibit A were stipulated into evidence.
 ***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 35 years old and had completed at least two years of college. Plaintiff began working for defendant-employer in December 1989. Defendant-employer is a records management company, which stores and manages records for government agencies, banks, and business customers. When plaintiff first started working for the company, he worked in one of the warehouses, but he was moved to other positions. Plaintiff ultimately became an account manager, which was a sales position. As an account manager, plaintiff was responsible for finding customers who were interested in his employers services and selling cubic feet of storage space, along with other records management services offered by the company.
2. As an account manager, plaintiff was paid on a commission basis, but received a "draw every month against both earned and unearned commissions for that year and received quarterly commission checks. If plaintiffs sales exceeded the cubic footage quota set by the company, then he received a bonus at the end of the year. Under the plan for 1993, plaintiff did exceptionally well and earned over $100,000.00 for the year. In addition, he sold storage space to a large customer, which could not be filled in 1993 because the company did not have enough warehouse space available. Consequently, the customer, Collins Aikman, had to wait until 1994 to have most of the records stored.
3. A dispute arose between plaintiff and defendant-employer regarding the commission he should receive for the Collins 
Aikman sale. Under the 1993 plan, the commission generated would have been approximately $25,000.00. However, the company decided that its sales force was making too much money for the business generated, so it changed the commission structure significantly as of January 1, 1994. Defendant-employer subsequently changed the system again as of July 1, 1994 to further reduce commissions. Plaintiff ultimately received a commission of $2,808.00 for the Collins Aikman account. Although in correspondence with the company plaintiff disputed the amount paid, he never received additional sums and apparently never pursued a breach of contract action in court.
4. Plaintiff claimed that his earnings for the year preceding his injury should include the additional compensation he would have earned for the Collins Aikman account under the 1993 plan. However, even if the Industrial Commission were a proper forum to resolve such a dispute, plaintiff did not prove by the evidence presented that he should have been paid under that plan or the precise amount he should have received pursuant to that plan. The terms of that plan were not in evidence.
5. Defendants have alleged that plaintiffs higher earnings from 1993 should not be considered in determining his average weekly wage because those earnings did not reflect what he was earning in late 1994. Defendants have taken the position that it would not be fair to them to include those earnings, although they changed their commission system twice in 1994, reducing plaintiffs salary substantially. Defendant-employer issued the pay plan in question and paid the commissions according to its own plan. Consequently, it is fair to defendants to consider plaintiffs wages for the entire year for purposes of computing his average weekly wage.
6. Based upon the Form 22 wage chart, plaintiffs average weekly wage is found to be $1,483.70, which yields the statutory maximum compensation rate in 1994 of $466.00. The average weekly wage amount was computed from annual earnings of $77,364.29.
7. On November 30, 1994 plaintiff sustained a compensable injury by accident. He slipped as he was walking up a flight of steps. When plaintiff grabbed the handrail, it pulled out from the wall, and he fell at least twenty steps to the floor. As a result of the fall, plaintiff was knocked unconscious for four to five minutes. An ambulance was summoned to take plaintiff to the hospital.
8. Once at the hospital, plaintiff complained of an occipital headache, neck pain, and left arm weakness. Various diagnostic tests were performed which did not reveal an acute abnormality in his brain or in his cervical spine. He was evaluated by several specialists and ultimately was treated by Dr. Adamson, a neurosurgeon, who diagnosed his condition as a probable injury to his brachial plexus. Plaintiff had much difficulty moving his left arm during his hospitalization and complained of numbness. He was discharged on December 3, 1994 with referrals to a brain injury clinic and to an orthopedic trauma clinic. However, no medical records are in evidence regarding those referrals.
9. Dr. Adamson treated plaintiff with progression physical therapy for his arm symptoms. During the first six months of 1995, plaintiff experienced improvement in his lower arm movement but continued to have limited movement in his shoulder and upper arm. Plaintiff was sent for electrodiagnostic studies which indicated normal nerve conduction and which did not show the expected patterns after a brachial plexus trauma. However, Dr. Adamson was concerned, in view of plaintiffs symptoms, that there was damage to the upper brachial plexus or upper trunk. The doctor continued to monitor his condition and ordered further physical therapy.
10. The symptoms in plaintiffs upper left arm persisted a year after his injury, so Dr. Adamson referred him for evaluation to Dr. Kline, a neurosurgeon at Louisiana State University who was an expert in brachial plexus conditions. Dr. Kline required additional testing before the appointment and on February 26, 1996 had plaintiff undergo another EMG and nerve conduction study there. There was no objective evidence of nerve injury in the cervical spine or in the brachial plexus. Since fourteen months had elapsed following the injury, Dr. Kline and his associate, Dr. Tiel, concluded that the weakness in plaintiffs arm was functional in nature and reported their findings to Dr. Adamson.
11. Dr. Adamson next saw plaintiff on April 15, 1996 and recommended a psychiatric evaluation. Consequently, on May 8, 1996 plaintiff was seen by Dr. Fitzgerald, a psychiatrist. Based upon the reports by the treating physicians, Dr. Fitzgeralds impression was that plaintiff had a conversion disorder and that the weakness in his arm was due to a subconscious psychiatric problem. The only potential underlying psychological issue the doctor could identify in the one office visit with plaintiff related to the fact that so many men in plaintiffs family had died young, so the doctor found that plaintiff had an unconscious conflict regarding issues of mortality. Dr. Fitzgerald recommended specific forms of therapy. Martha Claus administered psychotherapy to plaintiff until July 8, 1996.
12. When the case was heard before Deputy Commissioner Chapman on November 30, 1998, plaintiff reported that he was still having some problems with his arm and could not actively raise it over his head. However, when he saw Dr. Adamson on December 14, 1998 there was only a little weakness of his biceps and triceps muscles and of his grip strength. Dr. Adamson thought that plaintiff was 90 to 95 percent of normal. Dr. Adamson concluded that plaintiff had reached maximum medical improvement by that point and released him from medical care.
13. Defendants admitted liability for plaintiffs injury by accident of November 30, 1994 and paid for his medical treatment. However, defendant-employer continued to pay him a salary of $1,296.00 every two weeks. He also received a bonus in the amount of $5,946.00 on January 21, 1995. The bonus was earned prior to his injury. The bonus was not included in his annual earnings prior to the injury because, due to the cyclical nature of the bonus payments, there were also payments made in December 1993, which had likely been earned prior to November 30, 1993.
14. On March 2, 1995 plaintiff began working on a part-time basis from his home. Plaintiff worked approximately twenty hours per week until August 15, 1995 when Dr. Adamson allowed him to return to work on full time basis. During the period that plaintiff worked part-time, he continued to receive $1,296.00 every two weeks. From August 15, 1995 until the date of the hearing before the Deputy Commissioner, plaintiff worked regularly for the company on a full time basis. However, plaintiff was unable to earn the wages he had been earning at the time of his injury because of the changes, which had been made in the compensation plan. His employer further changed the commission structure by specifying which account representatives would handle the large, or Class A, accounts and which would handle the smaller, or Class B, accounts. Plaintiff was assigned to Class B accounts, which generated lower commissions.
15. Plaintiffs arm continued to bother him after he returned to work full time. Although his condition did improve, plaintiff was unable to move his shoulder and upper arm in a normal manner. Plaintiffs left arm problems did not affect his work performance according to his own testimony. He was capable of performing all of his normal duties after August 14, 1995. The fact that his earnings were reduced compared to the year before his injury was due to changes in the commission scale, which applied to all of the account representatives employed by the company, especially if they had been assigned to Class B accounts. Consequently, plaintiff suffered from no loss of earning capacity after August 14, 1995 due to his injury.
16. As of December 14, 1998 when Dr. Adamson last saw him, plaintiff had reached maximum medical improvement. He sustained no permanent partial disability as a result of his injury by accident in that there was no physical impairment arising from the injury.
17. The conversion reaction from which plaintiff suffered following his fall was a proximate result of the serious trauma he sustained in the accident.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. At the time of his injury by accident, plaintiffs average weekly wage was $1,483.70, which yields the maximum compensation rate of $466.00. N.C. Gen. Stat. 97-2(5).
2. Plaintiffs conversion reaction was a proximate result of his November 1994 injury by accident. Furthermore, this case is distinguishable from Brewington vs. Rigsbee Auto Parts,69 N.C. App. 168, 316 S.E.2d 336 (1984) because plaintiff sustained a serious fall which was unrelated to any psychological disorder and sustained physical injuries as a result of the fall.
3. Plaintiff was temporarily totally disabled as a result of his injury from December 1, 1994 through March 1, 1995. N.C. Gen. Stat. 97-29.
4. Defendants are not entitled to a credit for overpayment of benefits during the time plaintiff was totally disabled because the statute in effect on the date of injury provided for no carry-forward credit. N.C. Gen. Stat. 97-42 (as modified as effective September 1, 1994.)
5. Plaintiff was temporarily partially disabled from March 2 through August 14, 1995 due to his injury. Plaintiff is entitled to weekly compensation equal to 66 2/3% of the difference between his average weekly wages before the injury and the average weekly wages he was able to earn thereafter, subject to the maximum compensation rate allowed under N.C. Gen. Stat. 97-29. N.C. Gen. Stat. 97-30.
6. In that plaintiff was capable of performing all of his job functions on a full time basis as of August 15, 1995 and in that the reduction in his earnings thereafter was due to a company-wide restructuring of the compensation program and not to any disability associated with his injury, he is not entitled to further compensation for partial disability. N.C. Gen. Stat. 97-30.
7. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. G.S. 97-2(19); G.S. 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for temporary partial disability from March 2, 1995 through August 14, 1995 at the rate of 66 2/3% of the difference between his average weekly wages before the injury and the average weekly wages he was able to earn thereafter, subject to the maximum compensation rate allowed under N.C. Gen. Stat. 97-29. This compensation has accrued and shall be paid in a lump sum subject to the attorneys fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of this injury by accident.
3. An attorney fee of 25% of the compensation awarded in Paragraph One is approved for plaintiffs counsel and shall be paid directly to plaintiffs counsel.
4. Defendants shall pay the costs.
This the ___ day of May 2000.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/______________ RENE C. RIGGSBEE COMMISSIONER